UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jan Kuklenski,

        Plaintiff,

v.

Medtronic USA, Inc.,

        Defendant.

File No. 22-cv-438 (ECT/JFD)

**OPINION AND ORDER**

Pamela M. Spera and Clayton D. Halunen, Halunen Law, Minneapolis, MN, for Plaintiff Jan Kuklenski.

Marko J. Mrkonich, Claire B. Deason, and Daniel Bihrle, Littler Mendelson, PC, Minneapolis, MN, for Defendant Medtronic USA, Inc.

Plaintiff Jan Kuklenski is a Michigan citizen who worked for Minnesota-based Medtronic USA, Inc. In this suit, Kuklenski alleges that Medtronic unlawfully terminated her employment after she took medical leave. She asserts statutory claims under the Minnesota Human Rights Act, the federal Family and Medical Leave Act, and the Minnesota Whistleblower Act, and a promissory estoppel claim under unspecified state common law.[1]

---

[1]    At least as filed, there is federal-question *and* diversity-of-citizenship subject-matter jurisdiction over Kuklenski's Complaint. Kuklenski's claim under the Family and Medical Leave Act obviously raises a federal question. 28 U.S.C. § 1331. As for diversity jurisdiction, Kuklenski alleges facts plausibly showing that the matter in controversy exceeds the sum of $75,000. Compl. [ECF No. 1] ¶¶ 42, 47, 56, 64, 72. And there is complete diversity of citizenship. Kuklenski is a Michigan citizen, and Medtronic is a Minnesota citizen. Compl. ¶¶ 2, 3, 6; *see* Off. Minn. Sec'y State, *Business Record Details: Medtronic USA, Inc.*,

Medtronic seeks dismissal of the case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Medtronic's motion will be granted in part under Rule 12(b)(6). Difficult legal and factual questions remain regarding whether Kuklenski has statutory standing to assert a claim under the Minnesota Human Rights Act; the better answer at this early stage is to allow those claims to proceed. The motion also will be denied with respect to Kuklenski's claim under the Minnesota Whistleblower Act because Kuklenski alleges facts plausibly showing that she engaged in protected activity, the only element Medtronic challenges. The motion will be granted as to Kuklenski's claims under the Family Medical Leave Act and her promissory estoppel claim. Kuklenski has failed to allege facts plausibly showing essential elements of these two claims.

I[2]

*Kuklenski is a long-time Medtronic employee.* Kuklenski began her Medtronic employment in 1999 as a Cardiovascular Account Manager. Compl. [ECF No. 1] ¶ 9.[3] She would go on to hold other positions at Medtronic. Of particular relevance here, in

---

https://mblsportal.sos.state.mn.us/Business/SearchDetails?filingGuid=dee866a5-b1d4-e011-a886-001ec94ffe7f (last visited Oct. 10, 2022).

[2]    In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn entirely from Kuklenski's Complaint. *Hartman v. Bowles*, 39 F.4th 544, 545 (8th Cir. 2022).

[3]    Medtronic says that "at the time her employment ended," Kuklenski was employed by "Medtronic Integrated Health Solutions LLC, a wholly owned subsidiary of Medtronic USA." Def.'s Mem. in Supp. [ECF No. 7] at 1 n.1; *see* Harris Decl. [ECF No. 7-1] ¶ 4. If correct, and assuming this means Medtronic USA, Inc. is the LLC's sole member, then substituting the LLC as the named Defendant would not affect the presence of diversity jurisdiction. *See E3 Biofuels, LLC v. Biothane, LLC*, 781 F.3d 972, 975 (8th Cir. 2015) (recognizing that an LLC's citizenship is that of its member or members).

December 2018, Kuklenski became "Senior Director, Value Based Healthcare ("VBHC")
Partnership Lead, Americas." *Id.* ¶ 10.

*Though the precise duties of Kuklenski's position are not clear from the Complaint,*
*she worked frequently in Minnesota and had frequent contacts with Minnesota-based*
*supervisors and personnel.* Though a Michigan citizen, Kuklenski "routinely visited
Minnesota for work over the course of her career with [Medtronic]; in her 22 years of
employment, [she] was physically present in Minnesota for work approximately 20% of
the time." *Id.* ¶ 7. As part of her employment, Kuklenski also had regular remote contact
with Minnesota-based Medtronic personnel. She describes these contacts in a single
paragraph of her Complaint. There, she alleges to have "regularly reported to four different
Minneapolis-based supervisors[,]" had "numerous" contacts with other Minnesota-based
Medtronic personnel, participated in many "zoom calls and phone calls[,]" and observed
live broadcasts of periodic meetings. *Id.* ¶ 8.

*Kuklenski was asked—and agreed—to remain at Medtronic through a*
*reorganization and take on additional responsibilities.* In January 2021, during "an
asserted Medtronic reorganization," Medtronic Vice President Linda Engels asked
Kuklenski to remain at Medtronic "to assist … with pressing transition issues and to
manage all four VBHC partnerships." *Id.* ¶ 13. To that point, Kuklenski had managed just
two of those partnerships. *Id.* Kuklenski agreed "on the explicit condition that her
compensation, compensation structure, and title would remain the same." *Id.* ¶ 14. On
January 26, Engels agreed to those conditions. *Id.* ¶ 15. By staying with Medtronic
through the reorganization, Kuklenski missed out on fifty-two weeks' worth of severance

3

pay she would have received had her employment terminated as part of the reorganization. *Id.* ¶ 14.

*Medtronic altered Kuklenski's compensation structure a few months later.* On May 27, 2021, Medtronic changed Kuklenski's compensation from the "Medtronic Incentive Plan for non-commercial sales ("MIP") to a Sales Incentive Plan ("SIP"), a commission structured plan." *Id.* ¶ 16. The inference is that Kuklenski's compensation shifted from one that provided more guaranteed compensation to one that provided more commission-based compensation.

*Kuklenski objected to the change.* On June 1, Kuklenski asked to return to the MIP structure so that she and Medtronic would be "viewed as a trusted partner" in the VBHC relationships. *Id.* ¶ 17. Kuklenski explained that the MIP structure had "differentiated [them] from the many strategic suppliers attempting to emulate Medtronic." *Id.* ¶ 18. Kuklenski also wrote to her "direct boss," Joe Hensley, about the change. *Id.* ¶ 19. She "detailed, in writing, how the SIP compensation plan failed to adhere to Medtronic's" agreements with the four partnerships she managed ("VBHP Agreements"). *Id.*. Kuklenski wrote that the change violated a "clear and mutual understanding" that she would "represent Medtronic as a VBHC leader, unencumbered by a SIP, a sale, or a product" and "that the commercial and VBHC work must remain separate." *Id.* ¶¶ 20–21.

*Soon after objecting to her changed compensation structure, Kuklenski took FMLA leave.* The leave began on June 7. *Id.* ¶ 22. Kuklenski suffered from "an inner ear disease" that caused her "serious health problems," and her leave was for "required surgery and time off to heal." *Id.* The surgery was "more extensive and invasive than her surgeon had

anticipated," so Kuklenski "requested an extension of her leave until December 7, 2021, when she was prepared to return to work with no restrictions." *Id.* ¶ 23.  On September 15, after receiving the extension request, Senior Employee Relations Manager Rochelle Harris informed Kuklenski: "In order to meet our ongoing business needs, we are posting your position for sourcing and recruitment purposes.  If your position is still available when you are released to return to work full time, you may report back to that same position." *Id.* ¶ 24.

*Medtronic filled Kuklenski's position.*  On October 6, Harris emailed Kuklenski that Medtronic had offered her position to an applicant, meaning it was "being filled." *Id.* ¶ 25. Harris wrote that, as she had explained on September 15, "Medtronic could not accommodate further leave and need[ed] to fill [her] position." *Id.* ¶ 26.  In a telephone call, Harris told Kuklenski that her medical leave had caused Medtronic "hardship." *Id.* ¶ 27.  On December 2, Harris relayed to Kuklenski that her position would not be available on her extended return date. *Id.* ¶ 28.  Harris later informed Kuklenski that Medtronic "does not offer severance when an employee's position is filled in these circumstances." *Id.*

*Kuklenski filed her six-count Complaint in February 2022.*  She alleges that Medtronic has used reductions in force and reorganizations as part of a "systemic pattern and practice" designed to "change the makeup of its workforce, whether [] based on age, gender, or race," and that Medtronic uses "ages, sex, and race" when making termination decisions during reductions in force. *Id.* ¶¶ 30, 32.  Kuklenski alleges that Medtronic's reorganization in February 2021 was part of this pattern and practice, and that Medtronic

CASE 0:22-cv-00438-ECT-JFD   Doc. 17   Filed 10/12/22   Page 6 of 24

told Kuklenski that her position was eliminated when that wasn't so.  *Id.* ¶¶ 32–35.

Medtronic, Kuklenski alleges, hired "a younger, less qualified individual" to replace her.

*Id.* ¶ 34.   In Counts I and II, Kuklenski asserts age-discrimination claims under the

Minnesota Human Rights Act ("MHRA").  *Id.* ¶¶ 36–47.   In Count III, Kuklenski asserts

an MHRA disability-discrimination claim.  *Id.* ¶¶ 48–56.   In Count IV, Kuklenski asserts

a promissory estoppel claim, alleging that she forfeited severance pay in reliance on

Medtronic's promise that her job title and compensation would remain the same.  *Id.*

¶¶ 57–64.  In Count V, Kuklenski alleges that Medtronic violated the Family and Medical

Leave Act ("FMLA") by terminating her because of her decision to take FMLA medical

leave.  *Id.* ¶¶ 65–72.   And in Count VI, Kuklenski claims that Medtronic violated the

Minnesota Whistleblower Act ("MWA") by terminating her employment and "threatening

legal claims against her" in retaliation for her report that Medtronic had violated the VBHP

Agreements by placing her on a commission-based compensation model.  *Id.* ¶¶ 73–82.

## II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a

court must accept as true all factual allegations in the complaint and draw all reasonable

inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir.

2014).   Although the factual allegations need not be detailed, they must be sufficient to

"raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007).   The complaint must "state a claim to relief that is plausible on its face."

*Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

Medtronic seeks the dismissal of Kuklenski's MHRA claims in Counts I, II, and III on the ground that the MHRA protects only an employee "who resides or works in" Minnesota, Minn. Stat. § 363A.03, subdiv. 15, and Kuklenski, Medtronic contends, did not reside or work in Minnesota.[4] Kuklenski agrees that she does not reside in Minnesota. She argues in substance that the Complaint's allegations regarding (1) her occasional work-related physical presence within Minnesota and (2) her frequent work-related communications with Minnesota-based Medtronic employees plausibly show that she worked in Minnesota for purposes of the MHRA.

---

[4]    Medtronic characterizes this issue as jurisdictional.  In its view, the fact that Kuklenski did not reside or work in Minnesota means she lacks Article III standing to pursue her MHRA claims.  *See* Def.'s Mem. in Supp. at 4, 9.  This is not correct.  "When a plaintiff alleges injury to rights conferred by statute, two separate standing-related inquiries are implicated: whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives that plaintiff authority to sue (statutory standing)." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012).  "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an injury-in-fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Ctr. for Special Needs Tr. Admin., Inc. v. Olson*, 676 F.3d 688, 697 (8th Cir. 2012).  Statutory standing is *not* jurisdictional; it "goes to the merits of the claim." *Miller*, 688 F.3d at 934; *accord Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).  "Statutory standing is simply statutory interpretation: the question it asks is whether Congress, or the State, has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Miller*, 688 F.3d at 934 (quotation omitted).  There is no question Kuklenski has Article III standing.  She alleges injuries caused by age discrimination that may be redressed by a damages award.  Medtronic doesn't dispute this.  Medtronic's argument—that Kuklenski is not within the class of persons authorized to sue under the MHRA—instead raises the issue of statutory standing, a merits issue.

Considering just statutory text, what it means to "work[] in this state" for purposes of the MHRA, Minn. Stat. § 363A.03, subdiv. 15, seems obvious in some hypothetical cases and quite unclear in many others.  Consider, for example, a hypothetical individual who resides in Hudson, Wisconsin and drives every day to work in person in St. Paul.  No doubt such a person works in Minnesota for the MHRA's purposes.  Things get fuzzy pretty quickly after that.  What if, for example, that same Wisconsin resident worked from home 75% of the time and in Minnesota 25% of the time?  What if that Wisconsin resident worked only remotely for a Minnesota-based corporation performing job duties that—prior to the proliferation of remote work—were performed by an employee located at the company's Minnesota offices?  In other words, might purely electronic contacts with Minnesota-based co-workers be enough in some cases to show that an employee works in Minnesota?  Does the location of the person or persons responsible for the alleged discrimination matter?  Must the impact of the alleged discrimination occur in Minnesota? Pretty clearly, the MHRA's "works in this state" requirement is ambiguous.

The Minnesota Supreme Court has not answered what it means to "work[] in this state" for purposes of the MHRA.  Several cases from this District have.  Most of these answer the question essentially by analyzing whether the nature and quantity of a plaintiff's work-related Minnesota contacts are sufficiently substantial to warrant concluding that the plaintiff works in Minnesota.  *See Zarling v. Abbott Laboratories*, No. 21-cv-23 (MJD/BRT), 2021 WL 2551438, at *4 (D. Minn. June 22, 2021) (finding that plaintiff, who performed some work while vacationing at his Minnesota lake home, did not work in Minnesota for purposes of the MHRA); *Lapushner v. Admedus Ltd.*, No. 20-cv-572

(ADM/TNL), 2020 WL 5106818, at *5 (D. Minn. Aug. 31, 2020) ("Although Lapushner's sales territory did not include Minnesota, she attended trainings and business meetings in Minnesota, communicated with management located in Minnesota, and suffered alleged harassment and discrimination in Minnesota. These ongoing and significant connections to Minnesota are sufficient to constitute working in the state."); *Bernard v. St. Jude Med. S.C., Inc.*, 398 F. Supp. 3d 439, 467 (D. Minn. 2019) (finding essentially that the plaintiff, an Alabama resident, did not work in Minnesota merely because he was employed by a Minnesota-based company); *Wilson v. CFMOTO Powersports, Inc.*, No. 15-cv-3192 (JRT/JJK), 2016 WL 912182, at *6 (D. Minn. Mar. 7, 2016) (finding that the plaintiff worked in Minnesota based on the MHRA's "directive of liberal construction" and on the plaintiff's "clear physical presence in Minnesota as well as other direct, ongoing, and non-trivial connections to the state"); *Longaker v. Boston Sci. Corp.*, 872 F. Supp. 2d 816, 820 (D. Minn. 2012) (finding that the plaintiff, a California resident, did not work in Minnesota because "his entire employment with [the Minnesota-based defendant] took place in California[]"), *aff'd on other grounds*, 715 F.3d 658 (8th Cir. 2013); *Arnold v. Cargill Inc.*, No. 01-cv-2086 (DWF/AJB), 2002 WL 1576141, at **3–4 (D. Minn. July 15, 2002) (declining to apply MHRA to "[p]laintiffs who neither lived nor worked in Minnesota[]").

As Judge Patrick Schiltz has observed, however, a Minnesota-contacts-based approach to the issue may fairly be criticized because it "treat[s] the question almost as one of personal jurisdiction rather than as one of statutory interpretation." *Walton v. Medtronic USA, Inc.*, No. 22-cv-0050 (PJS/HB), 2022 WL 3108026, at *2 (D. Minn. Aug. 4, 2022). Or, to put it another way, going straight to a contacts-based approach seems to assume

that's what the Minnesota legislature intended § 363A.03, subdiv. 15 to require, but no case adopts this interpretation after addressing the factors the Minnesota legislature has identified as appropriate to ascertain its intent.   *See* Minn. Stat. § 645.16(1)–(8); *Christianson v. Henke*, 831 N.W.2d 532, 537 (Minn. 2013).

Extensive independent research hasn't yielded a clear answer to the statutory interpretation question. Other Minnesota statutes that, like the MHRA, have a work-in-Minnesota element have been interpreted using essentially the same contacts-based approach applied in the above-cited cases.  *See, e.g.*, *Hull v. ConvergeOne, Inc.*, 570 F. Supp. 3d 681, 691–92 (D. Minn. 2021).[5]  Other states' laws have received varying interpretations.  *See* Robert B. Fitzpatrick, *Which State Law Applies? Multi-Jurisdictional Conduct and State Employment Law Statutes*, SS032 ALI-ABA 1499 (2011).  And though the MHRA's "works in this state" requirement is said to follow from the "general presumption … against extra-territorial application of a state's statute[,]" *CFMOTO Powersports, Inc.*, 2016 WL 912182, at *5, it is not clear how that presumption might

---

[5]    Invoking the related-statutes canon, *in pari materia*, Medtronic argues that the MHRA should be construed in line with the Minnesota Personnel Record Review and Access Act.  Def.'s Mem. in Supp. at 12.  Under the canon, "two statutes with common purposes and subject matter [may] be construed together to determine the meaning of ambiguous statutory language."  *State v. Thonesavanh*, 904 N.W.2d 432, 437 (Minn. 2017) (citation omitted).  The canon does not apply here.  The Personnel Record Review Act defines "employee" as "a person who performs services for hire for an employer, provided that the services have been performed *predominately* within this state."  Minn. Stat. § 181.960, subdiv. 2 (emphasis added).  This predominance requirement, which Medtronic seeks to impose here, is not in the MHRA, and importing it would be a mistake.  *See Bd. of Educ. of City of Minneapolis v. Sand*, 34 N.W.2d 689, 694 (Minn. 1948).

affect the precise interpretation of the MHRA, *see* William S. Dodge, *Presumptions Against Extraterritoriality in State Law*, 53 U.C. Davis L. Rev. 1389 (2020).

All of this leads me to conclude that, for two reasons, it makes better sense to deny Medtronic's Rule 12(b)(6) motion with respect to Kuklenski's MHRA claims. First, Kuklenski has alleged facts sufficient to plausibly meet the Minnesota-contacts standard applied in the intra-District cases cited above. Kuklenski "routinely visited Minnesota for work over the course of her career" and, "in her 22 years of employment, [she] was physically present [here] for approximately 20% of the time." Compl. ¶ 7. At the time of her termination, Kuklenski "regularly reported to four different Minneapolis-based supervisors[]" and participated in frequent, regular contacts with Minnesota-based personnel, including those who are alleged to have perpetrated the discriminatory acts. *Id.* ¶ 8. Second, the questions identified above regarding statutory interpretation were not addressed in the Parties' submissions. As a practical matter, it seems wiser to decide those questions after the Parties have weighed in and on a more complete factual record.[6]

---

[6]    In support of its motion, Medtronic filed a sworn declaration that aims to discredit or supplement Kuklenski's allegations of Minnesota employment contacts. *See* Hensley Decl. Kuklenski disputes this evidence. *See* Pl.'s Mem. in Opp'n at 10–11. In conducting a Rule 12(b)(6) analysis, a court "generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (quotations and citations omitted). Especially when contested, testimony in an affidavit or declaration that contradicts a complaint's allegations should generally be disregarded. *Hajiabdi v. Metro. Transp. Network, Inc.*, No. 21-cv-268 (ECT/ECW), 2021 WL 5177413, at *6 (D. Minn. Nov. 8, 2021). Because it does not fall within that category of materials that are embraced by the pleadings, and because Kuklenski contests it, Medtronic's evidence will be disregarded at this stage.

B

"Under [the] FMLA, eligible employees are entitled to take leave from work for certain family or medical reasons, including a serious health condition that makes the employee unable to perform the functions of [their] position." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 864–65 (8th Cir. 2006) (quotation and citation omitted). The FMLA "provides eligible employees up to twelve work-weeks of unpaid leave in any twelve-month period and prohibits employers from discriminating against employees for exercising their rights under the Act." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002) (citing 29 U.S.C. §§ 2612, 2615(a)(2)).

Kuklenski alleges that Medtronic engaged in acts prohibited by the FMLA, and 29 U.S.C. § 2615(a) provides the basis for her claim. It reads:

> **(a) Interference with rights**
>
> > **(1) Exercise of rights**
> >
> > It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
> >
> > **(2) Discrimination**
> >
> > It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).

Our Eighth Circuit Court of Appeals "has recognized three types of claims arising under these two subsections. The first type, arising under § 2615(a)(1), occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid

responsibilities under the Act." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). "An employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.* Though in several older cases the Eighth Circuit has described this claim as one for "interference" with FMLA rights, *e.g.*, *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006), it more recently declared that "what we formerly described as 'interference' claims henceforth shall be called 'entitlement' claims." *Bosley v. Cargill Meat Solutions Corp.*, 705 F.3d 777, 780 (8th Cir. 2013) (citing *Pulczinski*, 691 F.3d at 1005). The second type of claim is one for "retaliation." *Pulczinski*, 691 F.3d at 1005–06. A retaliation claim arises under § 2615(a)(2) and occurs when an employee opposes any practice made unlawful under the FMLA. *Id.* The third type of claim

> arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA. In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment. An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA. The textual basis for such a claim is not well developed in [the Eighth Circuit's] cases, but the claim likely arises under the rule of § 2615(a)(1) that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights defined by the FMLA. To distinguish the "entitlement" claim under § 2615(a)(1), and the "retaliation" claim under § 2615(a)(2), we think it helpful to describe this sort of complaint as a "discrimination" claim.

*Pulczinski*, 691 F.3d at 1006 (citations omitted); *see also Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157 n.5 (8th Cir. 2016) (noting "unresolved

difference of opinion" in the Eighth Circuit as to whether a discrimination claim arises under § 2615(a)(1) or (a)(2)).[7]

Kuklenski identifies her FMLA claim as one for "retaliation," *see* Pl.'s Mem. in Opp'n at 15, but this is not correct under the Eighth Circuit's FMLA nomenclature.  The gist of Kuklenski's FMLA claim is that she was terminated for exercising her FMLA rights—that is, for taking FMLA leave.  *See id.* at 16 (asserting that "Kuklenski clearly alleges in her Complaint that Medtronic terminated her in retaliation for taking FMLA leave[]").  Kuklenski nowhere alleges that she opposed any practice made unlawful by the FMLA.  As the Eighth Circuit has made clear, a claim that an employer took adverse action against an employee after the employee exercised FMLA rights is a discrimination claim.  *Pulczinski*, 691 F.3d at 1006.

To establish a discrimination claim at this stage, Kuklenski must allege facts plausibly showing that Medtronic terminated her employment at least in part because she exercised FMLA rights.  *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir.

---

[7]     FMLA discrimination claims are evaluated "under the *McDonnell Douglas* burden-shifting framework that is applied in Title VII cases."  *Pulczinski*, 691 F.3d at 1007.  At the pleading stage, a plaintiff raising a discrimination or retaliation claim "need not plead facts establishing a prima facie case[.]"  *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021); *see also Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1016 (8th Cir. 2013).  "However, the 'elements of the prima facie case are [not] irrelevant to a plausibility determination in a discrimination suit.'"  *Warmington*, 998 F.3d at 796 (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)).  Rather, the allegations in the complaint must "'give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas*,' which in turn 'reduces the facts needed to be pleaded under *Iqbal*.'"  *Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 310, 316 (2d Cir. 2015)).  In other words, the elements of the prima facie case are "part of the background against which a plausibility determination should be made."  *Blomker*, 831 F.3d at 1056 (citation omitted).

2013); !*Pulczinski*, 691 F.3d at 1007 (citing *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 n.3 (8th Cir. 2012) and 29 C.F.R. § 825.220(c)). "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). Temporal proximity alone may suffice only if it is "very close." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted). In determining the temporal relationship between the two events, the Eighth Circuit "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (citation omitted). Without "something more," a gap of more than two months between the date the employer knew of the employee's planned use of FMLA leave and the adverse action "is too long" to show a causal connection between the two. *Id.* at 901 (citations omitted). "An employer may lawfully terminate an employee if, after the employee exhausts FMLA leave, she is 'unable to perform an essential function of the position because of a physical or mental condition.'" *Hasenwinkel v. Mosaic*, 809 F.3d 427, 433 (8th Cir. 2015) (quoting 29 C.F.R. § 825.216(c)); *accord Scruggs v. Pulaski Cnty.*, 817 F.3d 1087, 1094–95 (8th Cir. 2016).

Kuklenski has not plausibly alleged that her exercise of FMLA rights motivated Medtronic's decision to terminate her. The Complaint's allegations are that Kuklenski took FMLA leave beginning June 7, 2021. Compl. ¶ 22. That leave ended on August 30, 2021, which is twelve weeks after it began. Kuklenski alleges that she was not able to return to work at that time and required "an extension of her leave until December 7,

2021[.]" *Id.* ¶ 23.  On September 15—only after learning that Kuklenski was unable to return to work at the expiration of her leave—Medtronic informed Kuklenski that it would try to fill her position "to meet [its] ongoing business needs." *Id.* ¶ 24.  Medtronic added, however, that Kuklenski could "report back to [her] same position" if it was unfilled when she was "released to return to work full time." *Id.*  Medtronic first informed Kuklenski that it had offered her position to someone else on October 6. *Id.* ¶ 25.  Never mind when Medtronic learned of Kuklenski's planned use of FMLA leave.  The temporal gap between the start of Kuklenski's leave and her termination is roughly four months, meaning Kuklenski cannot rely on the temporal proximity to show causality.  The Complaint includes no other allegations suggesting that the termination occurred because Kuklenski took FMLA leave.  (If anything, the Complaint's allegations show that the termination occurred because Kuklenski was not able to return to work following her leave's expiration. *Id.* ¶¶ 23–28.)

Kuklenski advances several arguments to show that her Complaint includes allegations plausibly showing discriminatory intent, but none is persuasive. *First*, Kuklenski cites three of the Complaint's allegations as sufficient.  These include: (1) "By deciding to terminate Plaintiff shortly after her approved medical leave protected under the FMLA, and not allowing Plaintiff to substantially return to her employment in her position or a similar/equivalent one, Defendant violated Plaintiff's rights to which she was entitled in violation of 29 U.S.C. § 2615."  (2) "The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise affected her status as an employee."  (3) "The unlawful employment practices complained above was

16

performed by Defendant with malice and/or reckless indifference to the FMLA, which protects Plaintiff." *See* Pl.'s Mem. in Opp'n at 16 (quoting Compl. ¶¶ 69–71). These passages, however, assert legal conclusions that are not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

*Second*, Kuklenski points out that when Harris told Kuklenski her position would be filled, Harris said that "Medtronic could not accommodate further leave and that Medtronic needed to fill her position." Pl.'s Mem. in Opp'n at 16–17; *see* Compl. ¶¶ 25–26. As noted, however, Kuklenski's continued absence or inability to perform her duties after her FMLA leave expired gave Medtronic a lawful basis to replace her. It is difficult to understand how Harris's accurate description of Medtronic's FMLA rights might plausibly show unlawful retaliation.

*Third*, Kuklenski argues that Medtronic's refusal to pay her severance shows discriminatory intent. Pl.'s Mem. in Opp'n at 17; *see* Compl. ¶¶ 13–14, 28. But Kuklenski does not allege Medtronic was obligated or had promised to pay her severance when she was terminated. Again, it is difficult to understand how Medtronic's refusal to voluntarily pay severance shows discriminatory intent. It might be different had Kuklenski alleged that Medtronic regularly and voluntarily paid severance to departing employees. She doesn't allege anything like that.

*Fourth*, Kuklenski argues that a reasonable inference of retaliation follows from Harris's comment that her medical leave caused Medtronic "hardship." Pl.'s Mem. in Opp'n at 17; *see* Compl. ¶ 27. It is true that, in some cases, an employer's expressions of

"reticence or frustration" over an employee's exercise of FMLA rights may help to show causation. *Mell*, 557 F. Supp. 3d at 918. *But see Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (finding that supervisor's single comment, plus temporal proximity, did not establish employer's prohibited motive at summary judgment). But an isolated comment like Harris's, uttered absent any other facts suggesting discrimination, is not enough. Kuklenski pleads no facts to suggest, for instance, that Medtronic was reluctant to grant, resisted, or interfered with her decision to take leave. She does not allege that she was urged to return to work before her leave expired. She does not allege Medtronic's decision to terminate her occurred near her decision to take leave or while she was on leave.[8] Instead, Harris's reference to Kuklenski's "medical leave" occurred during her continued absence after her leave had expired.[9] The remark evidently followed Medtronic's decision to try to fill Kuklenski's position over two weeks after her leave expired and emails from

---

[8]    Kuklenski relies on *Jackson v. City of Hot Springs*, 751 F.3d 855 (8th Cir. 2014). There, Kuklenski points out, an employer responded to the employee's leave-extension request by expressing concern that he'd "been off work for his illness [for five months] and that his leave had created additional workload that the department could no longer handle." *Id.* at 862. Kuklenski likens these comments to the "hardship" comment she alleges Harris made here. *Jackson* is different. There was evidence of discriminatory animus. Jackson's supervisor told a fellow employee that Jackson's extension request was "only a ploy to prolong his insurance until he could get disability." *Id.* at 862. When Jackson sought to return, the supervisor made him reapply and did not hire him, despite support from three interviewers and "the fact that he was determined [by them] to be the most qualified applicant." *Id.* at 862–63. There was more: "unlike Jackson, the person [ultimately] hired did not have experience on all the machines in the department," and Jackson's former supervisor gave shifting explanations for not re-interviewing him, which tended to discredit his proffered reasons for not rehiring him. *Id.* We don't have anything like that here.

[9]    Kuklenski does not allege the date of Harris's "hardship" comment, but the sequence of allegations suggest it occurred between October 6 and December 2. *See* Compl. ¶¶ 25–28.

Harris stating that Medtronic was replacing Kuklenski to "meet [] ongoing business needs," that Medtronic "could not accommodate *further* leave," and that Kuklenski could be reinstated if her job was "still available when [she was] released to return to work full time." Compl. ¶¶ 24, 26 (emphasis added). Especially considered against these allegations, Harris's statement that Kuklenski's medical leave caused "hardship" to Medtronic cannot plausibly show discriminatory intent.

*Fifth*, Kuklenski cites the Complaint's allegations that Medtronic "did not assign the four VBHC Partnerships [Kuklenski] had managed to [her] replacement[,]" Pl.'s Mem. in Opp'n at 17, implying that this shows her termination was not justified by business reasons. There are innumerable lawful reasons why someone hired in Kuklenski's stead might not inherit all of her previous duties. Perhaps, for example, Medtronic declined to allocate Kuklenski's duties to a new hire in favor of allocating some to a more senior employee. This allegation does not contradict or call into question Harris's remarks that Kuklenski's absence caused "hardship" or that it was replacing Kuklenski to "meet [] ongoing business needs." The allegation does not "nudge[]" Kuklenski's FMLA discrimination claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (citation omitted); *see also Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) ("[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.") (citation omitted).

C

Medtronic seeks dismissal of Kuklenski's promissory estoppel claim (Count IV). To support this claim, Kuklenski alleges that Engels "agreed" that, if Kuklenski remained at Medtronic during its reorganization, her "compensation, compensation structure, and title would remain the same."  Compl. ¶¶ 13–15.  Kuklenski relied on this promise to her detriment, she alleges, by foregoing her entitlement to 52 weeks' severance pay.  *Id.* ¶ 58.

To state a promissory estoppel claim, Kuklenski must allege facts plausibly showing that (1) a clear and definite promise was made; (2) the promisor intended to induce reliance and the promisee in fact relied to her detriment; and (3) the promise must be enforced to prevent injustice.  *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000).  Promissory estoppel "impl[ies] a contract in law where none exists in fact."  *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn. 1981).  Minnesota recognizes a limited cause of action for promissory estoppel in the context of at-will employment, where "no contract exists because due to the bilateral power of termination neither party is committed to performance and the promises are, therefore, illusory."  *Id.*  In *Grouse*, a plaintiff quit his job, and declined a third-party job offer, based on the defendant's offer of at-will employment, but he was ultimately not hired.  *Id.* at 115–16.  The Minnesota Supreme Court held that, on those facts, the plaintiff "had a right to assume he would be given a good faith opportunity to perform his duties to the satisfaction of [the defendant] once he was on the job."  *Id.* at 116.  *Grouse* stands for the rule that "[i]n the employment context, a cause of action for promissory estoppel requires proof of a clear and definite promise of long-term employment terminable only for cause.  Absent such a promise, the

employee has no reasonable basis for relying on anything other than an at-will relationship." *Friedman v. BRW, Inc.*, 40 F.3d 293, 297 (8th Cir. 1994); *accord Fox v. T-H Cont'l Ltd.*, 78 F.3d 409, 415 (8th Cir. 1996). Additionally, "[*Grouse*] emphasized that, because defendant had offered only an at-will position, damages should be measured by what plaintiff lost in quitting his prior employ and turning down the other offer." *Friedman*, 40 F.3d at 297. To establish detrimental reliance, then, an at-will employee must show "'an actual change in the employee's position,' or at least a showing that the employee declined a lucrative opportunity or job offer in reliance on the promise." *Nelson v. SGS N. Am., Inc.*, No. 12-cv-2854 (SRN/JJG), 2014 WL 2746031, at *14 (D. Minn. June 17, 2014) (quoting *Waters v. Cafesjian*, 946 F. Supp. 2d 876, 882 (D. Minn. 2013)); *accord Hull*, 570 F. Supp. 3d at 705. Simply maintaining the "status quo" by continuing to work for an employer will not satisfy the detrimental reliance element of promissory estoppel. *Waters*, 946 F. Supp. 2d at 882; *accord Dumas v. Kessler & Maguire Funeral Home, Inc.*, 380 N.W.2d 544, 548 (Minn. Ct. App. 1986); *Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 309 (Minn. Ct. App. 1992) ("We recognize that where an at-will employee merely continues to work and does not claim to have turned down any offers of employment based upon an employer's representations, no reliance will be found.").

Kuklenski has not plausibly alleged a promissory estoppel claim. She has not plausibly alleged a clear and definite promise. Kuklenski alleges that she remained a Medtronic employee "on the explicit condition that her compensation, compensation structure, and title would remain the same." Compl. ¶ 14. Kuklenski alleges no facts regarding the promise's duration, however. And she alleges no facts suggesting that she

was promised long-term employment terminable only for cause, meaning she had "no reasonable basis for relying on anything other than an at-will relationship." *Friedman*, 40 F.3d at 297. She does not allege to have been denied a good-faith opportunity to perform her duties. Nor has Kuklenski shown detrimental reliance. Under *Grouse* and its progeny, Kuklenski's promissory estoppel damages are limited to losses suffered by foregoing other opportunities in reliance on Medtronic's promise. Kuklenski maintained the status quo— she does not allege to have pursued, or that she would have pursued, more lucrative employment opportunities elsewhere. She does not allege that accepting severance would have been more valuable to her than continuing with her Medtronic employment.

## D

Medtronic seeks dismissal of Kuklenski's retaliation claim under the Minnesota Whistleblower Act. Minn. Stat. § 181.932, subdiv. 1. The Act prohibits employer retaliation for an employee's good-faith report of "a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law." *Id.* Minnesota applies the *McDonnell Douglas* framework to retaliation claims under § 181.392. Without direct evidence of retaliatory animus, a prima facie case requires showing "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983)). The Act covers reports of breach of contract—a violation of Minnesota common law. *Moore v. City of New Brighton*, 932 N.W.2d 317, 324–25 (Minn. Ct. App. 2019); *Schwab v. Altaquip LLC*, No. 14-cv-1731

(PJS/JSM), 2015 WL 5092036, at *3 (D. Minn. Aug. 28, 2015).  "[T]here need not be an actual violation, [but] the *law* alleged to have been violated must exist.  If it later turns out that the facts are not as the employer reported them in good faith to be, the conduct is protected so long as the facts, if they had been true, would be a violation of the law."  *Kratzer v. Welsh Cos.*, 771 N.W.2d 14, 22–23 (Minn. 2009).

Kuklenski alleges that, after she reported in good faith a breach of contract, Medtronic retaliated by "terminating her employment and threatening legal claims against her."  Compl. ¶¶ 77–79.  The reported breach, alleges Kuklenski, was Medtronic's decision to switch her compensation structure from MIP to the commission-based SIP structure.  Kuklenski reported to her "direct boss" and "detailed, in writing, how the SIP compensation plan failed to adhere to" the VBHP Agreements with the four partnerships she managed: Lehigh Valley Health Network, Medical University of South Carolina, ChristianaCare, and Spectrum Health.  *Id.* ¶ 19.  Kuklenski reported that placing her on a commission-based compensation plan violated a mutual understanding that "the commercial and VBHC work must remain separate" and that her role was "to represent Medtronic as a VBHC leader, unencumbered by a SIP, a sale, or product."  *Id.* ¶¶ 20–21.

Medtronic does not argue that Kuklenski fails to allege an adverse action or a causal connection; it asserts that Kuklenski has not plausibly pleaded protected activity.  In Medtronic's view, Kuklenski's allegations do not show that switching her compensation to the SIP structure violated any contract.  Def.'s Mem. in Supp. at 22–23; Reply Mem. [ECF No. 12] at 12–14.  Medtronic also casts Kuklenski's report as a violation of *her own* contract with Medtronic, something it says is not actionable.  Def.'s Mem. in Supp. at 23–

24.  These arguments are not persuasive.  Kuklenski's allegations are thin, but they are clear enough: she reported, in good faith, that Medtronic's changes to her compensation structure breached its contracts with identified third parties.  Medtronic has cited no authority requiring Kuklenski to do more by, for example, precisely identifying the provision of each contract she says was breached.  At this stage, Kuklenski has adequately pleaded protected activity to support a claim under the Minnesota Whistleblower Act, and Medtronic's motion to dismiss Count VI will be denied.

## ORDER

Based on all the files, records, and proceedings in this matter, **IT IS ORDERED** that Defendant Medtronic USA, Inc.'s Motion to Dismiss Plaintiff's Complaint [ECF No. 5] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      The motion is **GRANTED** with respect to Plaintiff's claims for promissory estoppel (Count IV) and FMLA discrimination (Count V), and these claims are **DISMISSED** without prejudice for failure to state a claim on which relief may be granted.

2.      The motion is **DENIED** in all other respects.


Dated: October 12, 2022                        s/ Eric C. Tostrud
                                               Eric C. Tostrud
                                               United States District Court