UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Jan Kuklenski,                                              File No. 22-cv-438 (ECT/JFD)

      Plaintiff,

v.                                                          **CORRECTED
                                                            OPINION AND ORDER**

Medtronic USA, Inc.,

      Defendant.

_____

Pamela M. Spera, Kyle Patrick Hahn, and Pamela Johnson, Halunen Law, Minneapolis, MN, for Plaintiff Jan Kuklenski.

Marko J. Mrkonich, Avery Bennett, Claire B. Deason, and Daniel Bihrle, Littler Mendelson, PC, Minneapolis, MN, for Defendant Medtronic USA, Inc.

_____

      Plaintiff Jan Kuklenski is a Michigan citizen who worked for Minnesota-based Medtronic USA, Inc.  She asserts statutory claims under the Minnesota Human Rights Act and the Minnesota Whistleblower Act.  Kuklenski and Medtronic each have filed summary-judgment motions.  Kuklenski seeks partial summary judgment related to her disability-discrimination claim under the Minnesota Human Rights Act.  Medtronic seeks summary judgment against all of Kuklenski's claims.  Because a reasonable juror could not find that Kuklenski was an employee protected by the Minnesota Human Rights Act or Minnesota Whistleblower Act, Medtronic's motion for summary judgment will be granted.  This decision makes it unnecessary to consider the merits of Kuklenski's motion, and it will be denied as moot.

I[1]

*Kuklenski is a long-time Medtronic employee.* Kuklenski began her Medtronic employment in 1999 as a cardiovascular account manager. ECF No. 45-1 at 5 (19:4–6); *id.* at 14 (56:5–7). She went on to hold other positions at Medtronic, including as a business development manager for cardiovascular accounts, *id.* at 14 (57:1–2), before eventually becoming Director of Corporate Strategic Alliances in December 2018. *Id.* at 15 (66:24–67:4). In this position, Kuklenski served as a partnership lead in Medtronic's value-based healthcare team.[2] *Id.* at 15 (67:5–8). The value-based healthcare team managed Medtronic partnerships with four hospital systems: Spectrum, Lehigh Valley, Medical University of South Carolina, and Christiana Care. *Id.* at 11 (43:3–45:7).[3] Kuklenski spent most of her time managing the Spectrum partnership. *Id.* at 19 (88:1–9). She remained on Medtronic's value-based healthcare team through a Medtronic restructuring in early 2021. *Id.* at 19 (86:23–87:9). During this time, Medtronic did not

---

[1]   Unless otherwise noted, the facts are undisputed. Fed. R. Civ. P. 56(a).

[2]   In her deposition, Kuklenski defined value-based healthcare as "look[ing] at ways at how we could track patient outcomes, lower costs and improve patient care" by partnering with hospital systems to create digital platforms. ECF No. 45-1 at 42 (299:1–300:13).

[3]   It appears that these four partnerships, governed by Master Strategic Affiliation Agreements, were Medtronic's only value-based healthcare partnerships. *See* ECF No. 45-1 at 19 (86:23–87:22) ("Q: Was it communicated to you that there would be no expansion of additional partners? A: Oh, and that was a good thing. We never wanted to go beyond four, we told the partners we would not go beyond four, that was one of our promises.").

treat Kuklenski unfairly based on her age, disability, or gender. *Id.* at 11 (42:5–10); *id.* at 16 (72:22–73:2).

*Although Kuklenski never lived in Minnesota, she traveled to Minnesota for work through early 2020.* Kuklenski has never resided or owned property in Minnesota. *Id.* at 4 (17:22–24). She lived in Chicago beginning in 2008 and moved to Michigan in late 2020 or early 2021. *Id.* at 4 (14:11–15:5). Because Medtronic is headquartered in Minnesota, Kuklenski traveled to Minneapolis early in her career for trainings, customer events, and work-related projects. *Id.* at 13 (52:20–53:7); ECF No. 65-8 (317:1–3). As she transitioned to more senior roles at Medtronic, she traveled to Minnesota less often. ECF No. 45-1 at 13 (52:20–53:7). Kuklenski traveled to Minnesota for at least nine days in 2017, *id.* at 13 (52:8–16), at least nine days in 2018, *id.* at 13 (52:1–7),[4] and approximately 14 days in 2019, *id.* at 13 (51:1–24). Kuklenski was not physically present in Minnesota for work after February 2020, when the COVID-19 shutdowns and restrictions started. *Id.* at 12 (48:14–16); *see also* ECF No. 45-2 at 22 (141:1–8).

*Medtronic restructures under new leadership.* In late 2020, Medtronic leadership changed as the Chairman of the Board, Omar Ishrak, was replaced by Geoff Martha. ECF No. 45-1 at 7 (28:4–15). Under new leadership, Medtronic went through a restructuring process in late 2020 and early 2021. ECF No. 45-3 at 3 (25:7–9). The goal was to "restructure the organization under the Americas Region" to increase efficiency, contain

---

[4]   Kuklenski testified in her deposition that she was in Minnesota for more than nine days in 2017 and 2018. ECF No. 45-1 at 13 (52:11) ("No, it was definitely more than [nine days in Minnesota in 2017]."); *id.* at 13 (52:5) ("I would assume more [than nine days in Minnesota in 2018].").

costs, and make it easier for customers "to do business with Medtronic at the enterprise level." *Id.* at 3 (26:16–25). Value-based healthcare was Ishrak's initiative, and Martha "was very clear that his brand was going to be grit sales and a different focus than [Ishrak]." ECF No. 45-1 at 7 (29:21–30:15). Consequently, Medtronic deprioritized value-based healthcare as part of the restructuring. ECF No. 45-3 at 6 (99:8–19) ("[T]he decision had been made . . . to discontinue with the value-based healthcare at the time of the restructure.").

*Restructuring impacts the value-based healthcare team.* Although not entirely clear from the record, it appears that after the restructuring, value-based healthcare was no longer an independent team at Medtronic. *See* ECF No. 45-2 at 5 (26:1–16); ECF No. 45-3 at 8 (107:5–11). Some other members of the value-based healthcare team left Medtronic, including Kuklenski's supervisor. ECF No. 45-1 at 18 (80:9–21); *id.* at 19 (86:23–87:9). In January 2021, Kuklenski met with Linda Engels, a Medtronic Vice President, to discuss her role moving forward. ECF No. 45-1 at 19 (89:4–6); *id.* at 20 (91:4–22). Kuklenski enjoyed her value-based-healthcare work but was less interested in managing other accounts. ECF No. 45-3 at 7 (103:2–15); ECF No. 45-1 at 36 (226:12–18). Based on her conversation with Engels, Kuklenski decided to stay at Medtronic and manage the four value-based healthcare partnerships while working within Medtronic's enterprise accounts group. ECF No. 45-1 at 34 (218:1–3). At some point in early 2021, Kuklenski's role at Medtronic became Director of Enterprise Accounts. *See* ECF No. 45-2 at 4 (24:19–23) ("[Kuklenski's] role, as I understand it, evolved and she was then a director of enterprise accounts after the reorganization."). Eventually, Kuklenski's duties as a Director of

4

Enterprise Accounts would include growing important Medtronic accounts by contracting, managing quality control, and handling supply chain challenges. ECF No. 45-2 at 4 (22:18–23:8).[5]

*Problems arise as Kuklenski transitions to her new role.* Kuklenski expected to report directly to Engels, who acted as Kuklenski's interim supervisor, but instead was placed under Joe Hensley, a Medtronic Senior Managing Director of Enterprise Accounts. ECF No. 45-1 at 32 (213:9–13); *id.* at 11 (42:1–4) ("[Engels] never mentioned that I would be reporting to Joe Hensley, so I'm not sure when he became my boss."). Despite realizing at some point that she worked under Hensley, Kuklenski was reluctant to report to him about her value-based healthcare work. ECF No. 45-1 at 34 (220:16–24) ("Yeah, I know [Hensley] had a problem with my communication. . . . I was keeping his boss in the loop."). As Kuklenski explained in her deposition, "it didn't make sense why they had me reporting to Joe. . . . they just did totally different work than what I was doing."). ECF No. 45-1 at 34 (218:4–18). Kuklenski was also reluctant to transition to the commercial work expected from her new position at Medtronic. In a May 26, 2021 email, Engels outlined a transition year for Kuklenski to fully take on her commercial responsibilities as a Director of Enterprise Accounts. ECF No. 47-3 at 2 ("We will set clear expectations that in [Fiscal Year 2023 Kuklenski] WILL assume full responsibilities of the Enterprise Accounts role,

---

[5] Although Kuklenski was expected to manage commercial accounts as a Director of Enterprise Accounts, it is not clear exactly what duties of her new role, if any, Kuklenski was performing when she went on leave. Engels testified that Kuklenski was not performing all of the necessary duties of the director of enterprise accounts position before going on leave. ECF No. 45-3 at 7 (103:16–20). But little else is clear from the record.

including contracting. . . . We will work with her in [Fiscal Year 2022] on the training or transition plan required to assume this work in [Fiscal Year 2023].").

*Kuklenski raises concerns about sales commissions in her new compensation package.* Kuklenski was previously compensated under a Medtronic Incentive Plan that did not include sales commissions. ECF No. 45-1 at 35 (222:15–18). But on May 27, 2021, Kuklenski learned that she would be switched to a compensation plan that included sales commissions. ECF No. 45-1 at 45 (324:18–325:3). For Fiscal Year 2022, Kuklenski would be compensated with a base salary plus a commission contingent on the performance of her accounts. ECF No. 45-2 at 10 (49:8–12). Performance in this compensation plan was measured by account revenue. *Id.* at 10 (49:14–15). Kuklenski promptly raised concerns with Hensley that her new compensation model breached Medtronic's agreements with its value-based healthcare partners. ECF No. 45-2 at 8 (44). Shortly thereafter, Kuklenski called Medtronic's compliance team and Senior Vice President Dave Robert to raise her concerns. ECF No. 45-1 at 30 (192:11–22). Kuklenski also brought her concerns to Engels. ECF No. 45-2 at 9 (47). On June 1, she wrote a letter to Engels, explaining her concerns as follows: "The five VBHP Master Strategic Affiliation Agreements were negotiated and signed as non-commercial contracts. There is/was a clear and mutual understanding from both parties that open, trusting, and productive relationships is the understanding that my role is to represent Medtronic as a VBHC leader, unencumbered by a SIP, a sale, or product." ECF No. 47-1 at 33; 45-1 at 30 (192:22–23). Kuklenski sent a copy of this letter to Roberts. *Id.* at 30 (192:15–21).

6

*Medtronic moves forward with Kuklenski's new compensation plan.* After Kuklenski raised the issue with Hensley, he told her there were no conflicts. ECF No. 47-1 at 34. Hensley further discussed Kuklenski's compliance concerns with Medtronic's human resources department and Engels. ECF No. 45-2 at 8 (44:10–23). Engels confirmed with Hensley that "the new compensation model was not only legal but was the direction [Medtronic is] going to go." *Id.* at 9 (47:13–18). On June 3, 2021, Medtronic's compliance department contacted Kuklenski regarding her concerns, explaining the department was "working with the team that is scoping your new role to ensure that your duties are clearly delineated so as to avoid any compliance risks." ECF No. 47-1 at 35.

*Kuklenski undergoes ear surgery.* A few days later, Kuklenski underwent ear surgery. Kuklenski has "an ongoing inner ear disease called cholesteatoma." ECF No. 45-1 at 43 (307:20–21). The disease causes skin cells to become trapped behind the eardrum, resulting in an infection if left untreated. *Id.* at 43 (307:21–23). Kuklenski requires ongoing treatment for the disease, including intermittent surgeries. *Id.* at 43 (308:2–22). On June 7, 2021, she underwent surgery on her left ear, her third such surgery on the ear, *id.* at 6 (22:14–16), that was significantly more serious than the prior two, *id.* at 43 (308:23–309:11).

*Kuklenski goes on a medical leave of absence starting on June 7, 2021.* As a result of her surgery, Kuklenski went on medical leave starting on June 7, 2021. ECF No. 47-4 at 3. At first, Kuklenski requested only a couple days of leave. ECF No. 45-2 at 19 (91:23–25). Shortly thereafter, Kuklenski extended the leave in two six-week increments, followed by a one-week extension, to September 6, 2021. ECF No. 47-4; ECF No. 45-2 at

7

16 (79:9–80:15).  When Kuklenski took her first six weeks of leave, Medtronic separately assigned the four value-based healthcare partnerships on a regional basis.  *See* ECF No. 45-2 at 16 (78:2–11).  Michelle Valentine took over the largest partnership, Spectrum.  *Id.* at 16 (77:21–78:7).  In early September, Kuklenski requested three additional months of leave from September 7, 2021, to December 6, 2021.  ECF No. 51-15 at 5.

*Medtronic posts and fills Kuklenski's position.*  After Kuklenski requested three additional months of leave, Medtronic scheduled an "interactive" meeting with her on September 15, 2021.  ECF No. 45-1 at 37 (235:17–20).  In that meeting, Medtronic told Kuklenski that it could no longer hold open her position.  ECF No. 51-17 at 3.  Later that day Medtronic confirmed this in letter, explaining "[i]f your position is still available when you are released to return to work full time, you may report back to that same position," and if the position is filled, "you can also apply for other positions within the company."  *Id.*; *see also* ECF No. 45-4 at 13 (124:8–13).  Shortly thereafter, Medtronic posted Kuklenski's a position.  ECF No. 45-2 at 19 (90–91).  Medtronic then filled Kuklenski's Director of Enterprise Accounts role in October 2021, by internally hiring Eva Huls.  ECF No. 45-2 at 17 (82:8); *id.* at 19 (90:1–10).  On October 6, 2021, Medtronic emailed Kuklenski to inform her that "we have made an offer to a candidate this week, which means your position is being filled."  ECF No. 47-1 at 36.  On December 8, 2021, Kuklenski remotely logged into work.  ECF No. 45-1 at 10 (38:17–22).  Without a position to return to, Medtronic terminated her the same day.  ECF No. 45-1 at 9 (35:5–7).

*Kuklenski files this case.*  Kuklenski filed her six-count Complaint against Medtronic in February 2022.  Compl. [ECF No. 1].  In Counts I and II, Kuklenski asserts

8

age-discrimination claims under the Minnesota Human Rights Act ("MHRA"). *Id.* ¶¶ 36–47. In Count III, Kuklenski asserts an MHRA disability-discrimination claim. *Id.* ¶¶ 48–56. And in Count VI, Kuklenski claims that Medtronic violated the Minnesota Whistleblower Act ("MWA") by terminating her employment and "threatening legal claims against her" in retaliation for her report that Medtronic violated the value-based healthcare partnership agreements by placing her on a commission-based compensation model. *Id.* ¶¶ 73-82. Medtronic's previous motion to dismiss was granted in part, resulting in dismissal of Counts IV and V. ECF No. 17. Only the MHRA and MWA claims remain.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

A

Medtronic moves for summary judgment on Kuklenski's MHRA claims—Counts I, II, and III of the Complaint—on the ground that the MHRA protects only an employee "who resides or works in" Minnesota, as defined by Minnesota Statute § 363A.03, subdiv. 15. Kuklenski admits that she does not reside in Minnesota. *See* ECF No. 64 at 1–2; ECF

9

No. 45-1 at 4 (17:22–24). Kuklenski contends she is an employee who works in this state because she had frequent communication with Medtronic employees in Minnesota, her supervisors were mostly located in Minnesota, and "in addition to her many contacts with Minnesota, [she] visited the state to work for [Medtronic] on multiple occasions." ECF No. 64 at 3–4.

The definition of "employee" under the MHRA is a matter of statutory interpretation. Although some courts have characterized an individual's right to sue under the MHRA as a question of jurisdictional standing, the scope of a statute's protection is statutory standing, not Article III standing. *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012). And statutory standing is simply statutory interpretation. *Id.* (citation omitted). Under Minnesota law, "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16. Legislative intent is determined "primarily from the language of the statute itself." *Brayton v. Pawlenty,* 781 N.W.2d 357, 363 (Minn. 2010) (quoting *Gleason v. Geary,* 8 N.W.2d 808, 816 (Minn. 1943)). If the plain language of the statute is clear and unambiguous, "statutory construction is neither necessary nor permitted" and a court applies "the statute's plain meaning." *Id.* (quoting *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn.2001)). "But if the statute is ambiguous—that is, if it is susceptible to more than one reasonable interpretation—we apply canons of construction to discern the legislature's intent." *Alpine Glass, Inc. v. Ill. Farmers Ins. Co.*, 643 F.3d 659, 664 (8th Cir. 2011).

Start with plain meaning. Minn. Stat. § 363A.03, subdiv. 15 defines an employee as "an individual who is employed by an employer and who resides or works in this state." The phrase at issue is "works in this state." Neither "works" nor "in" is defined by the statute. If a statute does not define a word or phrase, Minnesota courts look to dictionary definitions. *Brayton*, 781 N.W.2d at 363–64. "Because the meaning of a phrase often depends on how it is being used in the context of the statute, [courts] examine words and phrases in context." *State v. Townsend*, 941 N.W.2d 108, 110 (Minn. 2020) (citing *State v. Henderson*, 907 N.W.2d 623, 626 (Minn. 2018)).

"In" is defined as "within the limits, bounds, or area of," The American Heritage Dictionary of the English Language 910 (3d ed. 1992), and is "used as a function word to indicate inclusion, location, or position within limits." Merriam-Webster's Collegiate Dictionary 627 (11th Ed. 2003). And "work" is defined as "a job; employment," The American Heritage Dictionary of the English Language 2056 (3d ed. 1992), or "the labor, task, or duty that is one's accustomed means of livelihood." Merriam-Webster's Collegiate Dictionary 1442 (11th Ed. 2003). Taken together, then, to "work[] in this state" means Kuklenski must perform duties of her job within the limits, bounds, or area of Minnesota. In other words, the statute requires at a minimum some physical presence within the geographic boundaries of the State of Minnesota. True, there are plenty of other ways to use the word in. *See, e.g.*, The American Heritage Dictionary of the English Language 910 (3d ed. 1992) ("a woman in love. . . . the office in command. . . . a note written in German."). But the State of Minnesota is a geographical entity with set boundaries. It would be unreasonable to read "works in Minnesota" any other way given the context.

This is especially true when considering the whole phrase "resides or works in [Minnesota]." There is no question that to reside in Minnesota uses the preposition to describe physical presence within a location, the geographical boundaries of Minnesota. *Cf. Piepho v. Bruns*, 652 N.W.2d 40, 44 (Minn. 2002) ("[I]n deciding what factors best implement the constitutional directive in Minn. Const. art. IV, § 6, that elected representatives reside in the district from which elected, we naturally focus on physical presence and intent."); The American Heritage Dictionary of the English Language 1535 (3d ed. 1992) (defining reside as "to live in a place permanently or for an extended period"). Just as "resides in" Minnesota requires an individual's physical presence, so to must "works in" Minnesota require an individual's physical presence. Therefore, the plain language of Minn. Stat. § 363A.03, subdiv. 15, requires at least a modicum of physical presence for an individual to be protected as an employee under the MHRA.[6]

---

[6] Even if Minn. Stat. § 363A.03, subdiv. 15 was ambiguous as applied to this case, other evidence of legislative intent does not support a different interpretation. Minn. Stat. § 645.16(4) directs courts to consider "the object to be attained." The public policy of the MHRA is "to secure for persons in this state, freedom from discrimination," Minn. Stat. 363A.02, subdiv. 1(a), not to secure freedom from discrimination for individuals in other states. And although Kuklenski is correct that the MHRA "shall be construed liberally," it must be construed liberally "for the accomplishment of the purposes thereof." Minn. Stat. § 363A.04. Because the purpose of the statue is "to secure for persons in this state, freedom from discrimination," this liberal presumption does not support extending statutory protections to persons with no physical presence in Minnesota. Considering "the consequences of this interpretation," pursuant to Minn. Stat. § 645.16(6), does not alter the reasonableness of this interpretation. When a plaintiff has no physical presence in Minnesota, that person will be covered by another state's statutory protections in addition to federal protections. Suffice to say, interpreting "works in this state" to require some physical presence does not undermine the MHRA's purpose.

It is undisputed that Kuklenski did not travel to Minnesota for work from February 2020 to December 8, 2021, when she was fired. During that time, she worked remotely from Michigan, California, and Illinois. ECF No. 45-1 at 18 (78:10–17). Kuklenski argues that she is protected by the MHRA because of her connections with Minnesota—in particular, her supervisors' location in Minnesota and her frequent video conference, telephone, and email contacts with Medtronic's Minnesota employees. But Kuklenski offers no alternative definition for "works in this state" to explain why these contacts are relevant. Perhaps Kuklenski means to suggest one could remotely "work[] in Minnesota," despite not physically being present. Such an interpretation is not plausible in view of plain text.[7] Without any physical presence in Minnesota, Kuklenski did not work in Minnesota in late 2020 or 2021, and thus was not an employee protected by the MHRA.

Kuklenski relies on other cases to show that her Minnesota connections are relevant, ECF No. 64 at 1–4, but the result here is consistent with those decisions. Courts have declined to find a plaintiff works in Minnesota without physical presence. *Longaker v. Boston Sci. Corp.*, 872 F. Supp. 2d 816, 820 (D. Minn. 2012) ("[H]is entire employment with BSC took place in California."); *Bernard v. St. Jude Med. S.C., Inc.*, 398 F. Supp. 3d 439, 467 (D. Minn. 2019) ("Bernard lived and worked in Alabama, not Minnesota"); *Balow v. Medtronic USA, Inc.*, No. 23-cv-843 (KMM-ECW), ECF No. 44 at 38 (D. Minn., July 7, 2023) ("[in other cases] there's that additional piece of the physical presence and visit

---

[7] Adding to the reasons to doubt Kuklenski's interpretation, the legislature amended the MHRA to define employee in 1987, *see* H.F. 1200, 1987 Leg., 75th Reg. Sess. (Minn. 1987), well before these remote communication technologies were in widespread use.

to the state that is not present in this case."). Courts finding a plaintiff works in Minnesota have identified at least some physical presence. *Wilson v. CFMOTO Powersports, Inc.*, No. 15-cv-3192 (JRT/JJK), 2016 WL 912182, at *6 (D. Minn. Mar. 7, 2016) (emphasizing that the plaintiff "physically spent time in the state" and "was expected to return to the state for future trainings and meetings"); *Lapushner v. Admedus Ltd.*, No. 20-cv-572 ADM/TNL, 2020 WL 5106818, at *5 (D. Minn. Aug. 31, 2020) ("Although Lapushner's sales territory did not include Minnesota, she attended trainings and business meetings in Minnesota. . . ."); *Walton v. Medtronic USA, Inc.*, No. 22-cv-0050 (PJS/HB), 2022 WL 3108026, at *2 (D. Minn. Aug. 4, 2022) ("The Court also finds that Walton has alleged that, throughout his long career, there was an ongoing expectation that he would travel to Minnesota every quarter or so to work on behalf of Medtronic."). True, those cases seem to rely on a Minnesota-contacts based approach to the MHRA definition of employee. But those cases are persuasive, not binding, and Kuklenski fails to explain why such an approach is reasonable as a matter of statutory interpretation when Kuklenski was not physically present in Minnesota at all from February 2020 through her termination on December 8, 2021.

This leads to the second major issue—how does Kuklenski's travel to Minnesota for work prior to February 2020 affect her status as an employee under the MHRA? Kuklenski argues that "[t]he case law, however, shows that even one visit to the state of Minnesota for work-related purposes is sufficient for an employee to be protected under the MWA and MHRA," ECF No. 64 at 2, and contends "Plaintiff should be considered an employee protected under the MHRA and MWA because she worked for [Medtronic]

14

while physically within the state," *id.* at 3. Kuklenski seems to suggest that an employee's past physical presence in Minnesota while working for the same employer is enough to protect them under the MHRA.

This interpretation is not reasonable. To start, reside and work in the MHRA are written in the present tense, a tense used to "express[] action or state in the present time and is used of what occurs or is true at the time of speaking and of what is habitual or characteristic." Merriam-Webster's Collegiate Dictionary 982 (11th Ed. 2003); *see also* Fowler's Dictionary of Modern English Usage 652 (4th Ed. 2015). If the Minnesota legislature wanted to protect individuals who resided or worked at some past time in Minnesota, it could have expressly done so. Moreover, Kuklenski's interpretation contradicts the presumption against extraterritoriality. "[T]here is a presumption against the extra-territorial application of a state's statutes." *Arnold v. Cargill, Inc.*, No. 01-cv-2086 (DWF/AJB), 2002 WL 1576141, at *2 (D. Minn. July 15, 2002) (citing *In re Pratt,* 18 N.W.2d 147, 153 (Minn. 1945)). One reason for the presumption is to "to avoid running afoul of the Commerce Clause of the United States Constitution." *Id.* (quoting *Union Underwear Co., Inc. v. Barnhart,* 50 S.W.3d 188, 193 (Ky. 2001)). To interpret the MHRA as protecting persons who once resided or worked in Minnesota from discrimination years later, when they no longer have any physical presence in Minnesota, is inconsistent with the presumption against extraterritoriality. Such an interpretation also is contrary to the express policy of the MHRA "to secure for persons *in this state,* freedom from discrimination." Minn. Stat. 363A.02, subdiv. 1(a) (emphasis added).

15

The better answer is that the MHRA protects individuals who reside or work in Minnesota when there is a direct connection between their Minnesota presence and their employer's statutory violation.[8] This is the only interpretation consistent with the present-tense use of reside and work, the presumption against extraterritoriality, and the purpose of the MHRA. With this interpretation in mind, Kuklenski's prior physical presence could be relevant if it showed ongoing physical presence in Minnesota for work. For example, Judge Schiltz found that a plaintiff worked in Minnesota based on allegations of "an ongoing expectation that [the plaintiff] would travel to Minnesota every quarter or so to work on behalf of Medtronic." *Walton*, 2022 WL 3108026, at *2. But here, Kuklenski's ongoing travel to Minnesota for work ended in February 2020, roughly a year before any alleged discrimination occurred. It makes no difference that Kuklenski might have been in Minnesota but for the COVID-19 pandemic. What matters is where she worked in 2021, when Medtronic allegedly violated the MHRA. Because she did not "work[] in this state" when Medtronic allegedly discriminated against her, a reasonable juror could not find Kuklenski was an employee protected under the MHRA.

The same follows for Count VI, Kuklenski's claim under the Minnesota Whistleblower Act. Minn. Stat. § 181.931, subdiv. 2 defines an employee as "a person

---

[8] This is not to suggest that an individual must be physically in Minnesota when the adverse action occurs. For example, if a Minnesota resident is terminated because of their age while on a business trip to Chicago, they would still be protected by the MHRA. The same follows for an individual who works in Minnesota: if a Wisconsin resident travels to Minnesota every day for work but is terminated because of their age while at home in Wisconsin, they would still be protected by the MHRA. Physical presence is necessary for an individual to be an employee as defined by the MHRA. Employees are protected from discrimination by the statute.

who performs services for hire in Minnesota for an employer." The previous analysis of "in this state" cross-applies to interpretating "in Minnesota" here. And as with the MHRA, courts have required physical presence to find a person is an employee protected under the MWA. *Kozloski v. Am. Tissue Servs. Found.*, No. 06-cv-295 (DSD/JJG), 2007 WL 2885365, at *4 n.8 (D. Minn. Sept. 27, 2007); *Krutchen v. Zayo Bandwidth Ne., LLC*, 591 F. Supp. 2d 1002, 1012 (D. Minn. 2008); *Rock v. Rathsburg Assocs., Inc.*, No. 21-cv-2717 (JRT/BRT), 2022 WL 4450418, at *6 (D. Minn. Sept. 23, 2022). The same presumption against extraterritoriality in conjunction with the present tense of perform means that Kuklenski's services performed for Medtronic in Minnesota before 2020 are not enough. Because Kuklenski stopped performing services in Minnesota in February 2020, more than a year before she reported changes in her compensation structure, a reasonable juror could not find she was an employee protected by the MWA.[9]

---

[9] This result is somewhat inconsistent with *Kozloski*. There, the court found a plaintiff was protected by the MWA "because he visited the Minnesota office as a part of his employment and thus 'performed[ed] services for hire in Minnesota for [the defendant].'" *Kozloski*, 2007 WL 2885365 at *4 n.8. *Kolzoski* is not persuasive for two reasons. First, the plaintiff in *Kozloski* was only employed from January 26, 2005, to October 13, 2005. It is unclear exactly when the plaintiff in *Kozloski* went to the Minnesota office or engaged in protected conduct under the statute, but it was at most a nine-month gap and likely far less. By contrast, Kuklenski reported her compensation changes roughly one year and four months after her last visit to Minnesota to perform services for Medtronic. Second, the court in *Kozloski* concluded the plaintiff "perform[ed] services for hire in Minnesota for [the defendant]." But to change "performs" to "performed[ed]" alters the tense of perform, and in turn the meaning of the statute. The better interpretation of the statute is that it requires some ongoing physical presence, a requirement absent here.

B

If Kuklenski were protected under the MHRA and MWA, Counts I, II, and VI would be dismissed on other grounds. Count I is Kuklenski's disparate-treatment age-discrimination claim. Although Kuklenski states a prima facie case of age discrimination, there is no genuine dispute of material fact that Medtronic had a non-discriminatory reason to fill her position—Kuklenski's six-month leave of absence. Nor could a reasonable juror decide Medtronic's reason was a pretext for age. As for Count II, Kuklenski's disparate-impact age-discrimination claim, she waived this claim by failing to respond in briefing. Moreover, she failed to identify specific employment practices allegedly responsible for observed statistical disparities. *See Hamblin v. Alliant Techsystems, Inc.*, 636 N.W.2d 150, 155 (Minn. Ct. App. 2001). Count VI is Kuklenski's claim under the Minnesota Whistleblower Act. Count VI fails for two other reasons. First, when an employee reports a breach of contract, the taken-as-true reported facts must constitute a breach of contract for the employee to state a MWA claim. *Schwab v. Altaquip LLC*, No. 14-cv-1731 (PJS/JSM), 2015 WL 5092036, at *4 (D. Minn. Aug. 28, 2015) (citing *Kratzer v. Welsh Cos., LLC*, 771 N.W.2d 14, 23 (Minn. 2009)). The reported facts did not constitute a breach of contract here. Second, the temporal proximity between Kuklenski reporting alleged problems with her new compensation structure and termination is not enough to draw an inference of causation. "Although a short interval between a plaintiff's protected activity and an adverse employment action may occasionally raise an inference of causation, in general, more than a temporal connection is required." *Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 697–98 (8th Cir. 2006) (cleaned

up). Even assuming the length of time should be measured from early June to early September, when Medtronic decided to fill Kuklenski's position, a reasonable juror could not find an inference of causation from this three-month gap. *Compare Moore v. City of New Brighton*, 932 N.W.2d 317, 329 (Minn. Ct. App. 2019); *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 445 (Minn. 1983); *with Freeman*, 467 F.3d at 697.[10]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendant Medtronic USA, Inc.'s Motion for Summary Judgment [ECF No. 42] is **GRANTED**.

2. Plaintiff Jan Kuklenski's Motion for Partial Summary Judgment [ECF No. 49] is **DENIED**.

3. This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: November 20, 2023      s/ Eric C. Tostrud
                              Eric C. Tostrud
                              United States District Court

---

[10] Count III, Kuklenski's disability-discrimination claim, is a closer call. Medtronic raises several arguments but relies heavily on *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177 (8th Cir. 2019). The facts of *Brunckhorst* are not identical to this case. There, the city eliminated the plaintiff's position instead of filling it, offered the plaintiff a specific alternative position instead of offering help to find a new position, and engaged in a more interactive process than Medtronic did here. *Id.* at 1181–82.